IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOTOMEDEX, INC., RADIANCY, INC., and PHOTOMEDEX TECHNOLOGY, INC., | : : : : |
| Plaintiffs, | : Civil Action No. |
| v. | : : : |
| DS HEALTHCARE GROUP, INC., | : : |
| Defendant. | : : : |

**COMPLAINT**

Plaintiffs PhotoMedex, Inc., Radiancy, Inc., and Photomedex Technology, Inc. file this action against Defendant DS Healthcare Group, Inc. for breach of contract and declaratory judgment because, as outlined below, DS Healthcare Group, Inc. fraudulently, willfully, and intentionally withheld material information from Plaintiffs, thereby inducing Plaintiffs to enter into merger agreements.  Among other things, the President, Chief Executive Officer, and Chairman of the Board of Defendant breached his fiduciary duty to the company, facilitated the preparation of fraudulent and misleading financial statements, engaged in self-dealing, and arranged for improper equity transactions, all of which is currently under investigation by the United States Securities and Exchange Commission.  Moreover, DS Healthcare Group, Inc. is now facing a delisting action by Nasdaq in the market trading of a public company.  Plaintiffs properly notified DS Healthcare Group, Inc. of its material and willful breaches and terminated the merger agreements, and now seek a judicial declaration that Plaintiffs' termination of the agreements was proper and entitles them to the payment of a termination fee and expenses as specified by the agreements.

1

## THE PARTIES AND AFFILIATED ENTITIES

1. Plaintiff PhotoMedex, Inc. ("PHMD") is a publicly-traded company incorporated under the laws of the State of Nevada with its principal place of business in Horsham, Pennsylvania.

2. PHMD is a global skin health company that provides aesthetic solutions to dermatologists, professional aestheticians, and consumers.

3. Plaintiff Radiancy, Inc. ("Radiancy") is a wholly-owned, directly or indirectly, subsidiary of PHMD organized under the laws of the state of Delaware with its principal place of business in Orangeburg, New York.

4. Plaintiff Photomedex Technology, Inc. ("P-Tech") is a wholly-owned subsidiary of PHMD organized under the laws of the state of Delaware with its principal place of business in Horsham, Pennsylvania.

5. Collectively, PHMD, Radiancy, and P-Tech are referred to herein as "PHMD Group" or "Plaintiffs."

6. Defendant DS Healthcare Group, Inc. ("DSKX") is a publicly-traded company incorporated under the laws of the state of Florida with its principal place of business located in Deerfield Beach, Florida.

7. DSKX is a developer of topical pharmaceutical and personal care products.

8. Non-party PHMD Consumer Acquisition Corp. ("Merger Sub A") is a wholly-owned subsidiary of DSKX organized under the laws of the state of Delaware.

9. Non-party PHMD Professional Acquisition Corp. ("Merger Sub B") is a wholly-owned subsidiary of DSKX organized under the laws of the state of Delaware.

10. Both Merger Sub A and Merger Sub B are shell companies without operations formed to acquire the assets of Radiancy and P-Tech under the merger agreements.

2

11. Non-party Daniel Khesin is an adult individual who, upon information and belief, resides in Boca Raton, Florida. Khesin is currently the President and Chairman of the Board of Directors of DSKX.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

13. This Court has jurisdiction over DSKX because DSKX has continuous business operations in the State of New York and because DSKX contractually agreed this Court would have jurisdiction.

14. Venue is appropriate under 28 U.S.C. § 1391 in this Court because the parties agreed to the exclusive venue of this Court in the merger agreements.

15. This action is not subject to compulsory arbitration because Plaintiffs seek declaratory judgment and monetary damages in excess of the arbitration threshold.

## THE MERGER AGREEMENTS

16. On or about February 19, 2016, PHMD entered into a definitive agreement to sell its consumer products and professional products businesses to DSKX for total consideration of approximately $48 million.

17. The proposed transaction was structured as two reverse triangular mergers and evidenced in two merger agreements.

18. The first agreement is an Agreement and Plan of Merger and Reorganization by and among PHMD, Radiancy, DSKX, and Merger Sub A whereby Radiancy would merge with and into Merger Sub A, with Radiancy remaining as the surviving entity after the merger ("Radiancy Merger Agreement").

3

19. A true and correct copy of the Radiancy Merger Agreement is attached hereto as **Exhibit A**.

20. Concurrently, PHMD, P-Tech, DSKX, and Merger Sub B entered into an Agreement and Plan of Merger and Reorganization whereby P-Tech would merge with and into Merger Sub B, with P-Tech remaining as the surviving entity after the merger ("P-Tech Merger Agreement," and together with the Radiancy Merger Agreement, the "Merger Agreements").

21. A true and correct copy of the P-Tech Merger Agreement is attached hereto as **Exhibit B**.

22. All capitalized terms not otherwise defined herein have the meanings given in the Merger Agreements.

23. Section 2.12 of both Merger Agreements outlines conditions necessary to Closing on the Mergers. Among other things:

(a) DSKX obtained the approval of the holders of a majority of the shares of DSKX's voting Common Stock pursuant to a proxy statement;

(b) No Material Adverse Effect (as defined by the Merger Agreements) shall have occurred and be continuing concerning the DSKX Business, the DSKX Business Assets, or DSKX;

(c) All representations and warranties under the Merger Agreements are true and correct in all material respects on the Closing Date;

(d) DSKX is not the subject of any legal proceedings, investigations, proceedings, or prohibition by any Government Authority that (i) would prevent the parties from consummating the transactions, (ii) reasonably be expected to have a Material Adverse Effect, (iii) would cause DSKX to breach any material representation, warranty, or covenant under the

Merger Agreements, or (iv) constitute a violation of the Rules and Regulations of the Nasdaq Stock Exchange; and

    (e) DSKX has complied with all conditions, covenants, and agreements to be complied with or performed under the Merger Agreements.

Exhibit A § 2.12; Exhibit B § 2.12.

  24. As a material inducement to Plaintiffs to enter into the Merger Agreements and consummate the Mergers, DSKX provided a number of representations and warranties to Plaintiffs.

  25. These included, among other things, representations and warranties regarding DSKX's capitalization (Section 4.3); DSKX's financial statements not containing any untrue statement of material fact and were prepared in accordance with GAAP (Section 4.4); DSKX not having any indebtedness or undisclosed liabilities (Section 4.5); DSKX Group operating in the Ordinary Course of Business in all material respects and an absence of changes with respect to the DSKX Business (Section 4.6); DSKX complying with all applicable Legal Requirements relating to the operation of all DSKX Business (Section 4.8); no pending or threatened Proceeding that could adversely affect DSKX or the DSKX Business Assets (Section 4.9); DSKX maintaining the proper accounting and disclosure controls (Section 4.22); and DSKX SEC Reports complying with applicable laws and not containing any untrue statement of material fact or omit a statement of material fact required to be stated or necessary to make the statements not misleading (Section 4.23).

  26. DSKX further agreed to certain covenants regarding the ongoing conduct of its business (Section 5.12), permitting representatives of PHMD to attend meetings of the DSKX board of directors (Section 5.16), and not offering, soliciting, or discussing or negotiating, sales of any of its equity interests (Section 5.9(g)).

5

27. PHMD is permitted to terminate the Radiancy Merger Agreement if, among other things, DSKX breaches or fails to perform any of its representations or warranties that result in the failure of any condition precedent to Closing and which cannot be cured by the Closing Date. Exhibit A § 8.1(d)(i); Exhibit B § 8.1.

28. PHMD is also authorized to terminate the Radiancy Merger Agreement if the DSKX Stockholder Approval was not obtained at the DSKX Stockholders Meeting. Exhibit A § 8.1(b)(iv); Exhibit B § 8.1.

29. Further, PHMD is entitled to payment of a $3 million termination fee from DSKX if the Radiancy Merger Agreement is terminated under Section 8.1(b)(iv) and there was a DSKX Triggering Event (the "DSKX Termination Fee"). Exhibit A § 8.1(d)(i); Exhibit B § 8.1.

30. A "DSKX Triggering Event" means, among other things, a material breach by DSKX of any of its obligations under Section 5.9 of the Radiancy Merger Agreement.

31. Under Section 5.9(g), DSKX represented that it would not, or cause its representatives "to, directly or indirectly, solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, or provide any nonpublic information to any Person . . . relating to any transaction involving the sale of . . . any of the equity interests of DSKX or any of its Subsidiaries . . ." Exhibit A § 5.9(g).

32. And, if PHMD terminates the Radiancy Merger Agreement under Section 8.1(b)(iv) and there was not a DSKX Triggering Event, PHMD is entitled to reimbursement of all of its fees and expenses incurred in connection with the transactions up to a maximum of $750,000 (the "DSKX Expense Reimbursement"). Exhibit A § 8.3(e).

33. The P-Tech Merger Agreement states that it may be terminated subject to the terms and conditions of Section 8.1 of the Radiancy Merger Agreement. Exhibit B § 8.1.

6

34. Additionally, the P-Tech Merger Agreement terminates automatically upon the termination of the Radiancy Merger Agreement.  Exhibit B § 8.2(b).

35. Upon termination of the Merger Agreements, the Merger Agreements become void and have no effect.  However, the Merger Agreements provide:  "[I]f there has been any material and willful, intentional or knowing (i) failure of any party to perform its covenants, agreements or obligations hereunder or (ii) breach by any party of its representations and warranties contained in [these Agreements], then such party will be fully liable for any liabilities or damages suffered by the other parties hereto as a result of such failure or breach."  Exhibit A § 8.2(a); Exhibit B § 8.2(b).

36. Additionally, the parties agreed that Section 8.3 (which includes the DSKX Termination Fee and the DSKX Expense Reimbursement) would survive termination of the Merger Agreements.  Exhibit A § 8.2(b); Exhibit B § 8.2(c).

**DSKX WILLFULLY, INTENTIONALLY, AND KNOWINGLY BREACHED THE REPRESENTATIONS AND WARRANTIES IN THE MERGER AGREEMENTS**

37. On the evening of March 21, 2016, Plaintiffs first learned that DSKX planned to make a material regulatory filing.

38. In a March 23, 2016 Form 8-K, DSKX disclosed material information concerning (1) its financial statements, and (2) an internal investigation.  None of the circumstances underlying these disclosures had been previously disclosed to Plaintiffs.

39. First, DSKX disclosed that its unaudited condensed consolidated financial statements for the two fiscal quarters ended June 30, 2015 and September 30, 2015 should no longer be relied upon because of certain errors.

40. A true and correct copy of the March 23, 2016 Form 8-K is attached hereto as **Exhibit C**.

7

41. The audit committee determined that these financial statements improperly recognized revenue, recorded certain equity transactions not in accordance with GAAP, and failed to disclose other equity transactions.

42. DSKX further disclosed that its audit committee and independent auditor believed the adjustments to the financial statements would be material when finalized, and that DSKX planned to file appropriate amendments to its Form 10-Q reports.

43. Second, the March 23, 2016 Form 8-K disclosed that on February 29, 2016, the audit committee engaged independent counsel to conduct an investigation regarding certain transactions regarding Khesin.

44. At the time, Khesin was the President of DSKX and a member and the Chairman of the Board of Directors of DSKX.

45. According to the March 23, 2016 Form 8-K, the audit committee started the investigation earlier in February, and the investigation included, but was not limited to, the revenue recognition and equity transactions that resulted in the need to adjust DSKX's financial statements.

46. On March 17, 2016, DSKX's Board of Directors terminated Khesin's employment as President and as an employee of DSKX for cause. The Board also unanimously removed Khesin as Chairman and a member of the Board for cause.

47. According to the March 23, 2016 Form 8-K: "The Board terminated Mr. Khesin for cause from both his employment and Board positions because the Board believes, based on the current results of the investigation, that there is sufficient evidence to conclude that Mr. Khesin violated his fiduciary duty to the Company and its subsidiaries."

48. Five days later, DSKX filed another Form 8-K in which it provided more details about the magnitude of the financial adjustments.

8

49. A true and correct copy of the March 28, 2016 Form 8-K is attached hereto as **Exhibit D**.

50. DSKX reported that the errors in the financial statements totaled approximately $900,000 in reduced revenues, resulting in estimated unaudited 2015 fiscal year revenues being reduced by approximately 6% to $13.0 million.

51. DSKX also disclosed that (i) 800,000 restricted shares of DSKX company stock were issued during the third quarter 2015 as compensation under a contract with a purported foreign distributor which DSKX believed lacked future economic value and would be expensed during the third quarter of 2015; and (ii) another 350,000 shares of DSKX common stock were issued to an investor-relations firm but, because no services had been provided by that firm to date, DSKX recorded the entire amount of equity award as an expense. DSKX stated that it believed all or a substantial portion of the restricted shares should be returned to DSKX for cancellation.

52. In the same Form 8-K, the chief executive officer of DSKX (Renee Barch-Niles) stated, in part, "there are no assurances that we will be able to complete the acquisition transactions with PHMD."

53. In an April 3, 2016 press release, DSKX further detailed the wrongdoing of Khesin.

54. A true and correct copy of the April 4, 2016 Form 8-K filed by DSKX, which includes the April 3, 2016 press release as an attachment, is attached hereto as **Exhibit E**.

55. DSKX stated that its Board of Directors and management called "for Federal Government to take action to protect shareholders after the former President of the Company, who was terminated for cause, violated Federal securities laws and unlawfully seized control of the Company."

56. DSKX disclosed that it had terminated Khesin for cause because he had engaged in self-dealing, acted against his fiduciary responsibilities as an officer of DSKX, and further "engaged in totally inappropriate conduct, including an illegal campaign of self-help, additional violations of the federal securities laws, as well as intimidation and defamation against Board members, management and outside professionals."

57. Among other things, the audit committee of DSKX reviewed documents "that demonstrated that Mr. Khesin engaged in a series of questionable stock transactions without board authorization, engaged in self-dealing and potentially engaged in transactions designed to artificially inflate the price of DSKX common stock."

58. DSKX provided evidence of Khesin's actions to the SEC, which started an investigation.

59. The press release further described how Khesin obtained voting agreements that allowed him to obtain 56.5% of DSKX's voting shares.

60. Khesin then used his majority shareholder position to terminate the existing board members and replace them with new board members friendly to his position.

61. According to the press release, Khesin also prevented management from accessing their company emails, while simultaneously searching and using the contents of those emails to obtain control of the company.  Khesin's actions led to the resignation of the chief financial officer of DSKX on April 2, 2016.

62. The United States District Court for the Southern District of Florida subsequently noted it was "disappointing that Khesin resorted to self-help rather than to legal channels" which created "uncertainty for both DS Healthcare and its shareholders."  However, it found that Khesin had not acted unlawfully in obtaining the voting agreements and had the authority to dismiss the former members of the board of directors and appoint new ones.

SL1 1417853v4 006109.00012

63. On April 20, 2016, DSKX was notified by Nasdaq that it was being delisted in accordance with Nasdaq Rule 5250(c) because DSKX had failed to file its annual report on Form 10-K for the year ended December 31, 2015.

64. A true and correct copy of the April 26, 2016 Form 8-K is attached hereto as **Exhibit F**.

65. Last, on May 2, 2016, DSKX announced that it had terminated its former independent auditor (who agreed with the audit committee that the financial statements of the company needed to be amended and restated) and appointed a new firm as its independent registered public accounting firm.

66. A true and correct copy of the May 6, 2016 Form 8-K is attached hereto as **Exhibit G**.

67. In sum, in the span of two months, DSKX publicly admitted to breaching the representations and warranties in the Merger Agreements because, among other things, (1) DSKX's financial statements had not been prepared in accordance with GAAP; (2) DSKX's business and assets had been materially misrepresented; (3) DSKX faced legal and regulatory actions, including an investigation by the SEC; (4) DSKX failed to file required regulatory filings, resulting in it being de-listed by Nasdaq; and (5) DSKX breached Section 5.9(g) of the Merger Agreements (as discussed below).

68. DSKX fraudulently and willfully hid the existence of its internal investigation from Plaintiffs. Plaintiffs were never advised of any of the facts underlying the investigation, including Khesin's breach of fiduciary duty, possible violation of federal securities laws, fraudulent misstatement of DSKX's financials, and improper reporting of certain equity transactions.

11

69. In fact, DSKX identified certain deficiencies in corporate policy and governance, including the issuance of stock without proper documentation and Board approval, as early as January 20, 2016, in a memorandum addressed to Khesin.  These concerns were not disclosed to Plaintiffs in connection with the negotiation of the Merger Agreements.

### KHESIN AND DSKX'S CONDUCT CREATED A SITUATION WHERE DSKX CANNOT FULFILL ITS OBLIGATIONS UNDER THE MERGER AGREEMENTS

70. The conduct outlined above has created turmoil and upheaval in DSKX and effectively ground the normal business operations of DSKX to a halt.  DSKX's willful and intentional actions have rendered its stock substantially below the price negotiated by Plaintiffs, thereby fundamentally changing the terms of the transactions.

71. A material reason for the transaction was the representations of DSKX and Khesin, which have now been called into serious question in public regulatory filings and are now being investigated by the SEC.  The previous board members who voted in favor of the transaction have now left the company.

72. DSKX now has an entirely different board of directors and management team than what was promised to Plaintiffs during the merger negotiations, and therefore they violated DSKX's obligation under the Merger Agreements that the business would be managed and operated in the ordinary course.

73. Additionally, the stock of DSKX cannot be traded.

74. Nasdaq delisted the stock of DSKX, and as a result of the changes in company management and the efforts needed to comply with Nasdaq rules, it is far from certain that Nasdaq's conditions will be satisfied to re-list the stock.

75. The misrepresentations, omissions, and other conduct described above have also created Material Adverse Events against DSKX and Khesin.

76. The SEC is in the process of investigating DSKX and/or Khesin.

12

77. DSKX is now a defendant in one or more class action lawsuits filed by shareholders of DSXK alleging violations of the federal securities laws.

78. The class action lawsuits allege, among other things, that DSKX made false or misleading statements, or failed to disclose: (1) there was a kickback scheme involving channel stuffing and fraudulent sales; (2) certain of DSKX's financial statements were false because DSKX improperly recognized revenues; (3) DSKX's unaudited financial statements contained certain equity transactions that were not in accordance with GAAP; (4) Khesin violated his fiduciary duty to DSKX and its subsidiaries; and (5) as a result, statements about DSKX's business, operations and prospects were materially false and misleading, or lacked a reasonable basis, at all relevant times.

79. In addition to the improperly recognized revenue and equity transactions that were disclosed in the Form 8-K filings, DSKX's financial statements are unreliable, and potentially fraudulent, in other respects.

80. Khesin admitted to representatives of Plaintiffs that DSKX had engaged in transactions that improperly and artificially inflated DSKX's revenue. This admission casts doubt on the accuracy and legitimacy of DSKX's reported income and ability to operate as a going concern.

81. DSKX materially breached Section 5.9(g) of the Radiancy Merger Agreement by improperly making an equity offering without prior consent of PHMD at a share price less than $2.00, notwithstanding its negative covenant in Section 5.12(k) of the Radiancy Merger Agreement.

82. Among other things:

(a) As announced by DSKX in an April 2, 2016 press release, members of DSKX's board of directors and the company's attorney allegedly conspired to defraud investors

by arranging a transaction to issue 2,000,000 shares of DSKX common stock to each other, for a price per share of $0.75, after the parties signed the Merger Agreements.

(b)  DSKX approached investors or potential investors, including investors who purchased shares of DSKX common stock in December 2015, and offered to sell shares of its stock at $0.75 per share, which is not permitted under the Merger Agreements.  According to an email from DSKX's counsel, this offering would amount to approximately 5,000,000 shares of DSKX, given DSKX's disclosure of its capitalization in the Merger Agreements.  *See* Exhibit A § 4.3(i).

83.  All the events described above have the effect of further devaluing DSKX and diluting the consideration for the Mergers.

84.  These events, including among other things, the ongoing SEC investigation, DSKX needing to meet Nasdaq's requirements for re-listing (including preparing and filing properly amended financial statements), and the outstanding shareholder lawsuits, mean that DSKX cannot do a proxy and thus obtain DSKX Stockholder Approval, as required and necessary under the Merger Agreements for Closing to occur.

85.  The inability to DSKX to obtain the required DSKX Stockholder Approval is the result solely of actions by DSKX and Khesin, and not any actions by Plaintiffs.

**PLAINTIFFS NOTIFY DSKX OF THEIR INTENTION TO TERMINATE THE MERGER AGREEMENTS AND DSKX FAILS TO NEGOTIATE IN GOOD FAITH**

86.  Recognizing the material breaches of representations and warranties and that the conditions precedent in Section 2.12 of the Merger Agreements could not occur, including the required DSKX Stockholder Approval, by letter dated April 12, 2016, PHMD Group notified DSKX of its breaches and PHMD's right to terminate the Merger Agreements.

87.  A true and correct copy of the April 12, 2016 letter is attached hereto as **Exhibit H**.

88. In the April 12, 2016 letter, Plaintiffs explained that DSKX had materially and willfully breached its representations, warranties, covenants, and agreements in the Merger Agreements, including but not limited to Sections 4.3, 4.4, 4.5, 4.6, 4.8, 4.9, 4.22, 4.23, 5.9(g), 5.12, and 5.16.

89. As a result of those material breaches, the conditions precedent in Section 2.12 of the Merger Agreements could not be able to occur.

90. Additionally, Plaintiffs notified DSKX of its intention to seek to recover the DSKX Termination Fee.

91. Pursuant to Section 8.3(d)(i), Plaintiffs are entitled to payment of the DSKX Termination Fee if the Merger Agreements are terminated under Section 8.1(b)(iv) and there has been a DSKX Triggering Event.

92. DSKX violated Section 5.9(g) of the Merger Agreements relating to the sale of undisclosed equity interests in DSKX as well as the offer and discussions to sell undisclosed equity interests, which constitutes a DSKX Triggering Event under the Merger Agreements.

93. The April 12, 2016 letter complies with the notice requirements set forth in Section 8.1(d)(i) of the Radiancy Merger Agreement.

94. Importantly, during a May 10, 2016 meeting of its board of directors, DSKX admitted that it cannot meet certain pre-conditions of the mergers, including with respect to audited financial statements, the SEC investigation, and the Nasdaq hold.

95. Moreover, during the same meeting, DSKX conceded that it owed the DSKX Termination Fee to Plaintiffs.  The minutes of the meeting shared with representatives of PHMD note a pressing concern for the company is "$3m at stake due to preconditions breach."

96. DSKX has been unable to correct the material breaches of its representations and warranties in the Merger Agreements.

97. While PHMD Group was working with DSKX in what it believed was good faith to resolve DSKX's breaches, DSKX sent a letter dated May 25, 2016 to PHMD outlining PHMD's alleged breaches of the Merger Agreements.

98. The May 25, 2016 letter is premised on four specious reasons and does not provide any basis for DSKX to terminate the Merger Agreements.

99. In fact, PHMD believes the reasons in the May 25, 2016 letter are manufactured in a transparent attempt to avoid DSKX's obligations to pay the DSKX Termination Fee, the DSKX Expense Reimbursement, and Plaintiffs' other damages caused by DSKX's willful, intentional, and knowing conduct as outlined above.

100. However, despite attempts to resolve the dispute in good faith, DSKX refused to compromise its position and maintained that Plaintiffs breached the Merger Agreements.

101. By letter dated May 27, 2016, Plaintiffs terminated the Merger Agreements pursuant to Sections 8.1(b)(iv) and 8.1(d)(i).

102. A true and correct copy of the May 27, 2016 letter is attached hereto as **Exhibit I**.

103. Plaintiffs terminated the Merger Agreement before DSKX Stockholder Approval was obtained, under Section 8.1(b)(iv).  The failure to obtain DSKX Stockholder Approval is the direct result of DSKX's actions as set forth above and through no cause of Plaintiffs.

104. Further, Plaintiffs terminated the Merger Agreement because of DSKX's material and willful breaches of the Merger Agreements as set forth above, which directly resulted in the failure of conditions precedent to closing on the Mergers, under Section 8.1(d)(i).

105. Plaintiffs informed DSKX of its entitlement to the DSKX Termination Fee because (a) Plaintiffs properly terminated the Merger Agreements under Section 8.1(b)(iv), and (b) there was a DSKX Triggering Event because of DSKX's material breach of its obligations under Section 5.9(g) of the Radiancy Merger Agreement.

16

106. As a result, a genuine controversy exists between the parties regarding whether or not DSKX breached the Merger Agreements, thereby allowing PHMD to terminate the Merger Agreements and recover the DSKX Termination Fee and the DSKX Expense Reimbursement.

107. Accordingly, Plaintiffs file this lawsuit seeking a declaratory judgment concerning DSKX's obligations to Plaintiffs under the Merger Agreements and for damages for breach of contract.

## COUNT I
## REQUEST FOR DECLARATORY JUDGMENT

108. Plaintiffs incorporate by reference Paragraphs 1 through 107 above as though set forth fully herein.

109. An actual controversy pursuant to the Federal Declaratory Relief Act, 22 U.S.C. § 2201, exists between PHMD, Radiancy, and P-Tech, on the one hand, and DSKX, on the other.

110. Plaintiffs properly terminated the Radiancy Merger Agreement pursuant to Section 8.1(b)(iv), and thereby the P-Tech Merger Agreement pursuant to Sections 8.1 and 8.2(b), because DSKX did not obtain Stockholder Approval for the Mergers and the failure was not the result of any action by PHMD.

111. Plaintiffs are entitled to payment of the DSKX Termination Fee because the Radiancy Merger Agreement was terminated under Section 8.1(b)(iv) and there was a DSKX Triggering Event, due to DSKX's material breach of Section 5.9(g) of the Radiancy Merger Agreement.

112. Additionally, Plaintiffs properly terminated the Radiancy Merger Agreement under Section 8.1(d)(i), and thereby the P-Tech Merger Agreement pursuant to Sections 8.1 and 8.2(b), because DSKX breached or failed to perform numerous representations and warranties in the Radiancy Merger Agreement (including without limitation those provided in Sections 4.3,

17

4.4, 4.5, 4.6, 4.8, 4.9, 4.22, 4.23, 5.9(g), 5.12, and 5.16) that in turn result in the failure of a condition precedent to closing, and which cannot be cured by the Closing Date.

113.  Plaintiffs are entitled to payment of the DSKX Expense Reimbursement because the Radiancy Merger Agreement was terminated under Section 8.1(b)(iv).  Exhibit A § 8.3(e).

114.  DSKX has taken the position that Plaintiffs breached their obligations under the Merger Agreements, including through an allegedly misleading press release and under Sections 2.12(h), 5.3, 5.11(c), and 5.10(a) of the Merger Agreements.

115.  An actual controversy exists over whether Plaintiffs are entitled to terminate the Merger Agreements.

116.  Among other things, the parties disagree about:

    (a)  Whether Plaintiffs or DSKX materially breached the Merger Agreements;

    (b)  Whether Plaintiffs are entitled to terminate the Merger Agreements;

    (c)  Whether DSKX is liable to pay the DSKX Termination Fee; and

    (d)  Whether DSKX is liable to pay the DSKX Expense Reimbursement.

117.  Plaintiffs are entitled to have the Court determine and declare that the Merger Agreements are terminated, DSKX is liable for payment of the DSKX Termination Fee to Plaintiffs, and that DSKX is liable for payment of the DSKX Expense Reimbursement.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against DSKX, and determine and declare:

    (a)  Plaintiffs properly terminated the Merger Agreements pursuant to Section 8.1(b)(iv) of the Radiancy Merger Agreement and Sections 8.1 and 8.2(b) of the P-Tech Merger Agreement;

    (b)  DSKX is liable to Plaintiffs for the DSKX Termination Fee;

(c) Plaintiffs properly terminated the Merger Agreements pursuant to Section 8.1(d)(i) of the Radiancy Merger and Sections 8.1 and 8.2(b) of the P-Tech Merger Agreement;

(d) DSKX is liable to Plaintiffs for the DSKX Expense Reimbursement; and

(e) such other relief as the Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT

118. Plaintiffs incorporate by reference Paragraphs 1 through 117 above as though set forth fully herein.

119. Prior to their termination, the Merger Agreements were enforceable contracts between Plaintiffs and DSKX (among other parties).

120. As outlined above, DSKX materially breached multiple representations and warranties in the Merger Agreements, or failed to perform its covenants, agreements, or obligations under the Merger Agreements, including without limitation those in Sections 4.3, 4.4, 4.5, 4.6, 4.8, 4.9, 4.22, 4.23, 5.9(g), 5.12, and 5.16.

121. These breaches or failures to perform were material and done willfully, intentionally, and knowingly.

122. As a result, DSKX remains fully liable for any liabilities and damages suffered by Plaintiffs as a result of DSKX's material breaches of the Merger Agreements. Exhibit A § 8.2(b); Exhibit B § 8.2(a).

123. Further, DSKX has breached the Merger Agreements by refusing to pay the DSKX Termination Fee that is due and owing by virtue of Plaintiffs' termination of the Merger Agreements pursuant to Section 8.1(b)(iv) of the Radiancy Merger Agreement and the occurrence of a DSKX Triggering Event.

124.  DSKX has also failed and refused to pay the DSKX Expense Reimbursement due and owing under Section 8.3(e) of the Radiancy Merger Agreement.

125.  DSKX's obligation to pay the DSKX Termination Fee and the DSKX Expense Reimbursement survives the termination of the Merger Agreements.  Exhibit A § 8.2(b); Exhibit B § 8.2(c).

126.  As a direct result of DSKX's material and willful, intentional, and knowing breaches of the Merger Agreements, Plaintiffs have suffered damages in excess of $150,000.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against DSKX, and enter an order awarding Plaintiffs compensatory damages in excess of $150,000, pre- and post-judgment interest, and such other relief as the Court deems appropriate.

**STEVENS & LEE, P.C.**

Dated:   New York, New York
            May 27, 2016

By: */s/ Bradley L. Mitchell*
Bradley L. Mitchell

485 Madison Avenue, 20th Floor
New York, New York 10022
(212) 319-8500
blm@stevenslee.com

Joseph E. Wolfson
620 Freedom Business Center, Suite 200
King of Prussia, Pennsylvania 19406
(610) 205-6019
jwo@stevenslee.com

*Attorneys for Plaintiffs PhotoMedex, Inc., Radiancy, Inc., and Photomedex Technology, Inc.*